U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 MAY 25 PM 4: 46

CLERK
BY ___PM___
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| DANA MACLEOD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 5:10-cv-286 |
| | ) |
| TOWN OF BRATTLEBORO and | ) |
| CHAD EMERY, | ) |
| | ) |
| Defendants. | ) |

# OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND ORDERING SUPPLEMENTAL BRIEFING AS TO WHETHER THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS
(Docs. 42 & 43)

Plaintiff Dana MacLeod brings this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Town of Brattleboro and Brattleboro Police Officer Chad Emery in his individual capacity[1] (collectively, "the Defendants"). Plaintiff alleges that Officer Emery violated Plaintiff's constitutional rights when he used excessive force in the course of Plaintiff's arrest.

Presently before the court are Defendants' motions for summary judgment (Docs. 42 & 43) seeking dismissal of Plaintiff's federal law claims because Officer Emery's use of force was reasonable and seeking dismissal of Plaintiff's state law claims based on governmental immunity. The court heard oral argument on these motions on December 22, 2011. In conjunction with its review of the case, and with the parties' consent, the court has reviewed two cruiser videotapes of the events in question.

---

[1] Plaintiff initially also brought suit against Officer Emery in his official capacity. Plaintiff voluntarily dismissed those claims as duplicative of Plaintiff's claims against the Town of Brattleboro. *See Escobar v. City of New York*, 2007 WL 1827414, at *3 (E.D.N.Y. June 25, 2007) ("A suit for damages against a municipal officer in their official capacity is the equivalent of a damage suit against the municipality itself.").

Plaintiff is represented by Thomas W. Costello, Esq. Officer Emery is represented by James F. Carroll, Esq. The Town of Brattleboro is represented by Nancy G. Sheahan, Esq.

I.  **Undisputed Facts.**

In setting forth the undisputed facts, the court considers only those facts relevant to Plaintiff's federal claims. In determining whether a fact is disputed, the court does not consider Plaintiff's challenges to facts that are not supported by references to the evidentiary record. *See D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations, nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.").

On September 27, 2009, between 7:00 and 8:00 p.m., Plaintiff was visited at his apartment by Brandon Theriault and another individual. Plaintiff admits he smoked marijuana prior to their arrival and consumed five or six rum and cokes between 6:00 p.m. and 10:00-11:00 p.m. Plaintiff's friends left Plaintiff's apartment at approximately 10:00 or 10:30 p.m. Thereafter, Plaintiff went to sleep.

On September 28, 2009, at approximately 2:30 or 3:00 a.m., Mr. Theriault returned to Plaintiff's apartment and awakened Plaintiff. After talking and playing video games, Plaintiff agreed to drive Mr. Theriault to McDonald's in Plaintiff's vehicle. Plaintiff drove while under the influence of alcohol.[2]

At approximately 5:30 a.m., Brattleboro Police Officer Adam Belville observed Plaintiff's vehicle exceeding the posted speed limit. It was still dark outside, and the

---

[2] At the time, Plaintiff had a criminal conviction in New Hampshire for Driving Under the Influence ("DUI") III for which his New Hampshire operator's license was suspended. His Vermont operator's license was also suspended as a result of a 2009 motor vehicle accident. As of September 28, 2009, he was facing a pending charge in Vermont for DUI fourth offense and for providing false information to a law enforcement officer. As a result of these pending charges, Plaintiff had a condition of release that prohibited him from buying, possessing, or consuming alcoholic beverages. There is no evidence that either Officer Emery or Officer Belville was aware of Plaintiff's criminal record although on September 27, 2009 Plaintiff had reported to the Brattleboro Police Department as his conditions of release required.

streets were wet. Officer Belville was operating a fully marked police cruiser when he activated the cruiser's lights, signaling for Plaintiff to stop his vehicle. Plaintiff initially did so, pulling over to the side of the highway. Officer Belville exited his cruiser. As he approached the rear operator's side of Plaintiff's vehicle, the vehicle pulled quickly away from the stop. When it did so, it was approximately a foot away from Officer Belville's body.

Officer Belville ran back to his cruiser, entered it, radioed that he was in a pursuit, and requested assistance. Officer Chad Emery, who was at the Brattleboro Police Department at the time, activated the recording equipment on his cruiser and drove to the area of pursuit.

As he fled the scene of the stop, Plaintiff travelled at speeds in excess of the posted speed limit through three intersections, two of which were marked with flashing yellow caution lights. Officer Belville pursued Plaintiff with his cruiser's lights and sirens activated for a distance of approximately 1.2 miles. At an intersection with a traffic light, Plaintiff drove through a red light. Other motorists were on the road at this time. Thereafter, Plaintiff pulled into the parking lot of a Wendy's restaurant, drove to the back side of the restaurant, stopped, and turned off his vehicle's engine. As Officer Belville pulled into the parking lot, Mr. Theriault immediately exited Plaintiff's vehicle and began to walk away from the vehicle. Plaintiff exited the vehicle as well, locked it, and put his keys into his right front pocket.

Officer Belville drew his firearm, pointed it at Plaintiff, and yelled commands for him to get down on the ground. Mr. Theriault immediately got into in a prone position on the ground. Plaintiff did not do so although he got into a kneeling position.

Officer Emery arrived on the scene and observed what was transpiring. At this point, Officer Belville's voice was high pitched and could accurately be described as a scream and Plaintiff was on his hands and knees, with his back to the officers and his hands facing away from them. Within moments of Officer Emery's arrival, Plaintiff struggled to get up on his feet, moving his arms to his side, and then quickly bringing them to the front of his body near his waist. Plaintiff put his right hand on the rear

3

driver's side bumper of his vehicle and stood up. He turned around and appeared unsteady on his feet, leaning back against his vehicle.

As Plaintiff stood up, from a distance of approximately fifteen feet, both officers repeatedly yelled commands at Plaintiff to get on the ground. Plaintiff saw both officers pointing their guns at him and heard their commands. Plaintiff moved his arms to an open position from his sides and asked the officers, "What?" In doing so, Plaintiff appeared confused and was unsteady on his feet.

The officers instructed Plaintiff to get on the ground several additional times. Plaintiff remained noncompliant with these commands. Officer Emery holstered his firearm, took out his Taser, aimed it at Plaintiff, and ordered him to get on the ground. Plaintiff did not do so and stood facing the officers with his hands in view. Officer Emery then yelled "Taser, Taser, Taser." Officer Emery deployed his Taser during or immediately after his third announcement of "Taser."

Approximately seventeen seconds elapsed between the time Officer Emery exited his cruiser and his deployment of the Taser. At the time of the Taser's deployment, the officers had not searched Plaintiff, his vehicle, or Mr. Theriault.

At some point after the tasing, Lieutenant Chuck Aleck, the shift supervisor, arrived on the scene. He made comments to the effect of: "Hey, how do you like the Taser? Good. Outstanding." It is not clear to whom these comments were directed. Plaintiff does not recall Lieutenant Aleck talking to him, although he does remember his presence at the scene. Plaintiff did not overhear any conversation between the officers.

One Taser probe struck Plaintiff in the left abdomen, and the other in his left chest area. The Taser was activated for approximately five seconds. Plaintiff did not lose consciousness but testified at a deposition that it "hurt a great deal, I lost all ability to stand up, initially it felt like a heart attack." (Doc. 44-1 at 65.) As Plaintiff was being tased, Officer Belville holstered his firearm and ran forward to take control of Plaintiff. At the end of the five second cycle, Officer Belville pulled Plaintiff to the ground, handcuffed him, and rendered assistance. As Plaintiff sat handcuffed on the pavement, Officer Emery told him "Do not move or you're gonna get it again. Do not move."

4

Thereafter, Plaintiff was transported to a local hospital for removal of the probes by a medical professional. The removal caused Plaintiff significant pain that lasted approximately fifteen to twenty seconds. Each time Plaintiff's vital signs were taken at the hospital, Plaintiff reported his pain level was zero (meaning no pain). After Plaintiff left the hospital, he was transported to the Brattleboro Police Department where he submitted to an alcosensor test that revealed a blood alcohol content of .22% at approximately 8:30 a.m.

A Taser X26 was employed in this incident. When it is deployed at a subject, it propels a pair of barbed probes which are connected to the Taser by thin insulated wires. Upon contact with the subject, the Taser X26 delivers a high voltage charge which overrides the subject's central nervous system and causes uncontrollable muscle contractions, thus temporarily incapacitating the subject. Tasing generally does not result in permanent injury.

## II. Conclusions of Law and Analysis.

### A. Standard of Review.

Summary judgment must be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations and citation omitted). In deciding the motion, the trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, and deny the motion if a rational juror could decide in favor of that party under the applicable law. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before the court." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993).

To avoid summary judgment the non-moving party must offer more than "mere speculation and conjecture[,]" *Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, only "disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

In assessing whether there are triable issues of fact, the court may rely on facts as depicted in an unaltered videotape and audio recording, even when such facts contradict those claimed by the nonmoving party. *See Winfield v. Trottier*, 2011 WL 4442933, at *5 (D. Vt. Sept. 21, 2011).

### B. Whether *Heck v. Humphrey* Bars Plaintiff's § 1983 Claim.

Although not addressed by the parties, the court must first consider whether Plaintiff is barred from bringing a civil action for injuries arising out of his arrest until his convictions stemming from that arrest are declared invalid. *See Heck v. Humphrey*, 512 U.S. 477 (1994).

In *Heck*, the Supreme Court held that a plaintiff can bring claims for money damages pursuant to 42 U.S.C. § 1983 unless "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Heck*, 512 U.S. at 487. The Second Circuit has held that the application of *Heck* turns on "whether a prisoner's victory in a § 1983 suit would *necessarily demonstrate* the invalidity of his conviction or sentence; that a prisoner's success might be merely helpful or *potentially* demonstrative of illegal confinement is, under this standard, irrelevant." *McKithen v. Brown*, 481 F.3d 89, 102 (2d Cir. 2007).

Under *Heck* and *McKithen*, Plaintiff's claims are barred if success on those claims would necessarily imply the invalidity of his state law conviction.[3] "To make this determination, the court must consider the elements of the criminal offense of which the § 1983 plaintiff was convicted." *Strepka v. Jonsgaard*, 2010 WL 4932723, at *4 (D. Colo. Nov. 8, 2010). Under Vermont law, "[a] person who intentionally attempts to prevent a lawful arrest on himself or herself, which is being effected or attempted by a law enforcement officer, when it would reasonably appear that the latter is a law enforcement officer" is guilty of the offense of resisting arrest pursuant to 13 V.S.A. § 3017. The lawfulness of the officer's conduct is thus an essential element of the offense of resisting arrest under § 3017.

In this case, the court concludes that even if Plaintiff prevails on his excessive force claim, Officer Emery's use of the Taser would not negate the lawfulness of Plaintiff's arrest or negate the unlawfulness of Plaintiff's attempt to resist arrest. *See Hooper v. Cnty. of San Diego*, 629 F.3d 1127, 1133 (9th Cir. 2011) (holding plaintiff's § 1983 claim that excessive force was used during her arrest would not necessarily imply or demonstrate the invalidity of her state law conviction for resisting arrest); *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006) (noting a plaintiff alleging excessive force "does not collaterally attack his conviction [or] deny that he resisted. . . . Rather, [plaintiff] claims that he suffered unnecessary injuries because [the] response to his resistance . . . was not . . . objectively reasonable."); *Martinez v. City of Albuquerque*, 184 F.3d 1123, 1127 (10th Cir. 1999) ("The state court's finding that Martinez resisted a lawful arrest . . . may coexist with a finding that the police officers used excessive force to subdue him."); *Nelson v. Jashurek*, 109 F.3d 142, 145-46 (3d Cir. 1997) (permitting an excessive force claim when plaintiff alleged that the officer "effectuated a lawful arrest in an unlawful manner"). Accordingly, the court finds that Plaintiff's § 1983 claim is not barred by *Heck* as it does not imply that his conviction, if any, under 13 V.S.A. § 3017 was invalid.

---

[3] Plaintiff does not dispute the lawfulness of his arrest or that he resisted arrest.

## C. Whether Officer Emery's Conduct Constituted Excessive Force.

As the legal underpinning of his § 1983 claim, Plaintiff alleges that Officer Emery violated his constitutional rights under the Fourth Amendment to the U.S. Constitution by using excessive and unnecessary force. Claims of excessive force during an arrest are analyzed under the Fourth Amendment's general reasonableness standard. *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006); *Graham v. M.S. Connor*, 490 U.S. 386, 394 (1989). "In order to establish that the use of force to effect an arrest was unreasonable . . . plaintiffs must establish that the government interests at stake were outweighed by the 'nature and quality of the intrusion on [plaintiffs'] Fourth Amendment interests.'" *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) (quoting *Graham*, 490 U.S. at 396). Evaluating a claim of excessive force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Jones*, 465 F.3d at 61; *Towsley v. Frank*, 2010 WL 5394837, at *7 (D. Vt. Dec. 28, 2010) (quoting *Graham*).

Once the court has determined the relevant facts and drawn all inferences in favor of the nonmoving party, the court's determination of reasonableness at the summary judgment stage is a question of law,[4] and must be made from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). This means that the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular

---

[4] The Second Circuit and the Supreme Court address objective reasonableness inquiries in other Fourth Amendment contexts as questions of law for the court. *See, e.g., Brigham City, Utah v. Stuart*, 547 U.S. 398, 406 (2006) (reasonableness of police entry into home); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) (reasonableness of arrest or search); *Brown v. City of Oneonta*, 235 F.3d 769, 776 n.2 (2d Cir. 2000) (reasonableness of a stop or seizure).

situation." *Id.* at 396-97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (quoting *Graham*, 490 U.S. at 397).

In determining reasonableness, courts examine the totality of the circumstances, and in doing so generally consider the seriousness of the crime under investigation, the magnitude of the governmental interests at stake, whether there were exigent circumstances, whether the use of less force was feasible and prudent, and whether the officer took reasonable steps to minimize the use of force and any injury resulting from that force. *See generally Towsley*, 2010 WL 5394837, at *7-10.

In this case, the officers at the scene could not clearly foresee the nature and seriousness of the crimes with which Plaintiff might ultimately be charged. At a minimum, Officer Belville observed Plaintiff speeding, attempting to elude a police officer, and running a red light. In addition, Plaintiff endangered Officer Belville's safety by abruptly pulling away at the scene of the initial roadside stop. In addition to the observed offenses, Officer Belville could reasonably suspect that Plaintiff was driving under the influence, fleeing a crime scene, or was a fugitive from justice as the nature and extent of Plaintiff's flight were excessive in response to a mere traffic stop. *See Tracy*, 623 F.3d at 97 (use of force was reasonable where "the scope of the crime in question was not simply driving without a license or criminal impersonation but was unknown and potentially far more serious," and where officer "had ample basis to presume that [individual] was at that time a fugitive seeking to evade capture"). The seriousness of the crimes under investigation was thus unknown but was clearly not trivial.

The court next examines the magnitude of the governmental interests at stake. While it was still dark outside and visibility was limited, Plaintiff travelled in excess of the posted speed limit on wet roads through several intersections including one with a red light with other vehicles and possibly pedestrians present. After stopping in response to cruiser lights and sirens (thus acknowledging his awareness that law enforcement was in pursuit), Plaintiff sped away from the stop as Officer Belville approached his vehicle. These activities posed a direct threat to public safety. *See Cordova v. Aragon*, 560 F.

9

Supp. 2d 1041, 1058 (D. Colo. 2008) (finding use of force was reasonable in light of public safety risk where, among other actions, individual "(1) refus[ed] to stop while being pursued by multiple police vehicles with their lights and sirens activated [and] (2) r[an] through at least two red lights"). They also posed a direct threat to the safety of a law enforcement officer. *See Tracy*, 263 F.3d at 97 (finding "a potentially serious and imminent risk to" the officer's safety such that use of force was reasonable where the individual attempted to flee); *Landy v. Irizarry*, 884 F. Supp. 788, 799 (S.D.N.Y. 1995) (considering, among other factors, that individual had attempted to flee on two occasions prior to use of force).

At the scene of the tasing, the magnitude of the government interests at stake increased as officers were confronted with a suspect who appeared to continue to resist arrest. *See Tracy*, 623 F.3d at 98 (finding use of force was reasonable where suspect was clearly resisting arrest). This occurred in a public parking lot of a fast food restaurant where customers could be expected to be present at all hours of the day. Plaintiff refused to obey repeated police commands to get down on the ground even when confronted with a brandished and presumably loaded firearm.

When Officer Emery arrived at the scene, Officer Belville was outnumbered by two suspects who were both outside their vehicle. *See Tracy*, 623 F.3d at 98 (noting officer proceeded on his own without the assistance of other officers when determining use of force was reasonable). The arrival of Officer Emery did not significantly diminish the safety risk as Plaintiff remained noncompliant and actually got to his feet when Officer Emery arrived. *See Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 128 (2d Cir. 2009) (holding officer's use of force was reasonable where suspect ignored command to stay still and refused to allow officer to apply handcuffs). The officers did not know whether Plaintiff or his passenger were under the influence of drugs or alcohol, although Plaintiff's conduct and unsteadiness on his feet strongly suggested he might be. *See Towsley*, 2010 WL 5394837, at *8 (noting suspect was combative and under the influence of drugs in concluding first tasing was reasonable). In addition, the officers did not have an opportunity to search Plaintiff, his passenger, or his vehicle, and

thus it was unknown if Plaintiff was armed or whether a weapon or weapons were within reach. *See Carey v. Cassista*, 939 F. Supp. 136, 143 (D. Conn. 1996) ("plaintiff did pose 'an immediate threat to the safety of the officers or others' in that [the officer] did not know whether plaintiff was armed"). These facts establish that the government interests at stake were substantial and that the circumstances could accurately be described as exigent.

The court next examines whether Officer Emery's actions were a reasonable response to the circumstances with which he was confronted. As Plaintiff concedes, the officers' initial show of force through brandished firearms was reasonable. *See Hinz v. City of Everett*, 2010 WL 3212001, at *1, 4 (W.D. Wash. Aug. 10, 2010) (holding officer's decision to brandish firearm was "eminently reasonable" where plaintiff resisted officer's commands prior to his arrest); *Anderson v. City of Bainbridge Island*, 2010 WL 4723721, at *4 (W.D. Wash. Nov. 17, 2010) (concluding officers acted reasonably in drawing their guns where plaintiff's "original flight from the officers was not an effort to resist arrest, per se, but it was clearly an effort to evade police."). Indeed, Plaintiff's noncompliance with police orders alone was sufficient to justify a show and use of some level of force.[5]

Having found his initial show of force reasonable, the court considers whether Officer Emery took reasonable steps to minimize his actual use of force and any resulting injury. It is beyond dispute that Officer Emery's use of the Taser constituted a de-

---

[5] Courts have held that failure to comply with a lawful police order can constitute a "serious infraction," *Hayes v. City of Seat Pleasant*, 2010 WL 3703291, at *7 (D. Md. Sept. 16, 2010), and may justify not only a show of force but the use of force. *See Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002) (determining it was reasonable for law enforcement to use force where the suspect had already disobeyed one direct order from law enforcement); *Jackson v. City of Bremerton*, 268 F.3d 646, 652-53 (9th Cir. 2001) (stating law enforcement officers' use of force was not excessive where officers "were faced with a group that refused to obey the officers' commands"); *Towsley*, 2010 WL 5394837, at *7 (finding officer reasonably used Taser in part because plaintiff "failed to comply with twenty-six direct orders to submit to arrest."); *Davis v. Callaway*, 2007 WL 1079988, at *5 (D. Conn. Apr. 9, 2007) ("Indeed, some degree of physical force is incident, and even necessary, to making an arrest, especially in situations where the suspect has previously refused to comply with the officers' orders.").

escalation of force after both verbal commands and the threat of deadly force failed to produce the desired results.⁶ By holstering his firearm and brandishing the Taser and shouting "Taser, taser, taser," Officer Emery offered Plaintiff yet another albeit brief opportunity to comply with police commands in response to a lesser show of force. Plaintiff remained noncompliant. These facts weigh heavily in favor of finding Officer Emery's use of the Taser as a last resort reasonable. *See Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 409 (D. Vt. 2009) ("using a Taser as a last resort to effect the arrests of suspects who are resisting, who have repeatedly been given lawful orders with which they could have easily complied, and who received . . . warnings specifically about the use of [the Taser], is not unreasonable"), *aff'd*, 2010 WL 4595545 (2d Cir. Nov. 15, 2010).

Against the significant government interests at stake, as well as the efforts by law enforcement to use lesser means to effect Plaintiff's arrest, the court must weigh Plaintiff's right not to be tased. The Taser has been described as "more than a non-serious or trivial use of force but less than deadly force," that is a "serious intrusion into the core of the interests protected by the Fourth Amendment[.]" *Mattos v. Agarano*, 590 F.3d 1082, 1087 (9th Cir. 2010).⁷ Although the tasing was admittedly a serious intrusion

---

⁶ *See Tanberg v. Sholtis*, 401 F.3d 1151, 1162 (10th Cir. 2005) ("[W]here force is warranted, officers should assess the incident in order to determine which technique or weapon will reasonably de-escalate the incident and bring it under control safely. Officers shall use only that force which is reasonable and necessary to effect lawful objectives.") (internal quotation marks and citations omitted); *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) ("As we have previously explained, an additional factor that we may consider in our *Graham* analysis is the availability of alternative methods of capturing or subduing a suspect."); *Kalma v. City of Socorro, Tex.*, 2008 WL 954165, at *7 (W.D. Tex. Mar. 17, 2008) ("The use of force continuum instructs officer candidates to respond to threatening situations by using the least amount of force necessary such that these situations can be de-escalated without offending a person's constitutional rights. A use of force continuum includes the following responses, as necessary: officer presence, verbal command, soft hand, hard hand, intermediate weapon, and deadly force.").

⁷ In asking this court to find the tasing here unreasonable, Plaintiff relies heaving on the Ninth Circuit's opinion in *Bryan v. McPherson*, 590 F.3d 767 (9th Cir. 2009). That opinion has been superseded twice. In its most recent November 30, 2010 version of the opinion, the Ninth Circuit found that while the officer's use of stun gun for arrestee's failure to wear a seatbelt was

upon Plaintiff's Fourth Amendment rights, Plaintiff was not permanently injured, received immediate attention from the officers at the scene, and did not appear to be in obvious distress as he sat on the ground after being tased. *See Hernandez v. City of New York*, 2004 WL 2624675, at *7 (S.D.N.Y. Nov. 18, 2004) (finding no constitutional violation based on excessive force claim where defendant testified that he did not request medical attention after his arrest and that he had pain but no specific, identifiable injury).

Considering the totality of the circumstances, not from hindsight but as they appeared to the officers on the scene, the court concludes that, as a matter of law, Officer Emery acted reasonably under the circumstances when he deployed his Taser. Correspondingly, the court further concludes that Officer Emery's use of the Taser was not a violation of Plaintiff's Fourth Amendment rights. As a result, Officer Emery's motion for summary judgment as to Count Six of the Complaint is hereby GRANTED.

### D. Plaintiff's § 1983 Claim Against the Town of Brattleboro.

In Count Five of his Complaint, Plaintiff claims the Town of Brattleboro is liable to him pursuant to 42 U.S.C. § 1983 based on its unconstitutional policy and practice and/or inadequate training of its agents, namely, Officer Emery. The Town seeks summary judgment on the ground that Plaintiff has failed to establish that an official Town of Brattleboro policy or custom caused a deprivation of his Fourth Amendment rights. In addition, it asserts that Plaintiff cannot establish municipal liability or deliberate indifference on the part of the Town by arguing that Officer Emery made the wrong decision in this case, or that a modification to the Town of Brattleboro's training and supervision policies would be helpful to its officers. In response, Plaintiff concedes that "Brattleboro's written policy sets forth guidelines for the use of tasers that conform to the reasonable use and generally accepted practice of police agencies," but he argues

---

excessive, its use did not violate clearly established Fourth Amendment rights even though, among other things, arrestee was unarmed, was wearing only boxer shorts and tennis shoes, made no physical or verbal threats, was not warned that a stun gun would be used, and was not facing the officer when he was shot in the back from a distance of fifteen to twenty five feet. *See Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010)

13

that the Town's "training, interpretation and execution of that policy are not reasonable and deviate significantly from generally accepted police practices." (Doc. 47 at 23.)

Under § 1983, "a municipality may be held liable for a constitutional violation if the plaintiff can prove that the violations resulted from a municipality's customs or policies." *Smith v. Edwards*, 175 F.3d 99, 107 (2d Cir. 1999). Thus, "a municipality may not be held liable [under § 1983] solely on the basis of *respondeat superior*." *Powell v. Gardner*, 891 F.2d 1039, 1045 (2d Cir. 1989) (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

In order for a plaintiff to establish that a municipality is liable under § 1983, a plaintiff "is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983). The Second Circuit has held that "a municipality cannot be liable for inadequate training or supervision when the officers involved in making an arrest did not violate the plaintiff's constitutional rights." *Curley v. Vill. of Suffern*, 268 F.3d 65, 71 (2d Cir. 2001); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("[I]f [the police officer] inflicted no constitutional injury on respondent, it is inconceivable that [the city] could be liable to respondent."); *Escalera v. Lunn*, 361 F.3d 737, 749 (2d Cir. 2004) (granting summary judgment in favor of the county where evidence failed to establish basis for claim against individual defendants).

Here, the court has concluded that Officer Emery did not violate Plaintiff's Fourth Amendment rights. Accordingly, there can be no liability on the part of the Town of Brattleboro because Plaintiff has failed to establish an essential element of his § 1983 claim against that entity. The court therefore GRANTS the Town's motion for summary judgment as to Count Five on Plaintiff's excessive force claim.

### E. Plaintiff's State Law Claims.

Counts One through Four and Seven through Ten, the remaining counts of Plaintiff's Complaint, allege causes of action arising under Vermont law. Specifically, Plaintiff alleges claims against Defendants for assault and battery, negligent infliction of emotional distress, intentional infliction of emotional distress, negligence, vicarious

14

liability, and negligent training and supervision. The parties have not addressed the issue of whether the court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims.

A district court may decline to exercise jurisdiction over state law claims when:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Section 1367(c) "confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which the district courts can refuse its exercise." *City of Chicago v. Int'l Coll. Of Surgeons*, 522 U.S. 156, 173 (1997).

The general practice in the Second Circuit is that "if a plaintiff's federal claims are dismissed before trial, the state claims should be dismissed as well." *Brzak v. United Nations*, 597 F.3d 107, 113-14 (2d Cir. 2010) (internal quotation marks and citation omitted); *see also Edmonds v. Seavey*, 379 F. App'x 62, 64 n.1 (2d Cir. 2010) ("As there existed no independent basis for subject matter jurisdiction over appellant's remaining state law claims, the district court was well within its discretion to decline to exercise supplemental jurisdiction over those claims.") (citing *Matican v. City of New York*, 524 F.3d 151, 154-55 (2d Cir. 2008)); *S&R Dev. Estates, LLC v. Bass*, 588 F. Supp. 2d 452, 464 (S.D.N.Y. 2008) (dismissing all federal claims, declining to exercise supplemental jurisdiction over state claims, and declining to exercise jurisdiction over plaintiff's request for declaratory relief which arose under state law); *Connolly v. City of Rutland, Vt.*, 2011 WL 3739064, at *20 (D. Vt. Aug. 24, 2011) ("Having concluded that Defendants are entitled to summary judgment on [plaintiff's] federal claims, the [c]ourt declines to retain supplemental jurisdiction over the pendent state law claims.").

As the Supreme Court explained in *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343 (1988), where "all federal-law claims are eliminated before trial, the balance of

factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state law claims." *Id.* at 350 n.7; *see id.* at 350 ("When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.") (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726-27 (1966)).

Although this case is not in its early stages, it is also not on the eve of trial, and Defendants' motions for summary judgment represent the first time Plaintiff's claims have been addressed by the court. Comity may be better served by having a state court decide the state law questions that Plaintiff poses. *Gibbs*, 383 U.S. at 726-27 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law," and state law claims should be "left for resolution to state tribunals."); *see also Locantore v. Hunt*, 775 F. Supp. 2d 680, 689 (S.D.N.Y. 2011) ("Plaintiff's federal claims are all dismissed prior to trial, and there is no reason to believe that judicial economy, convenience, or fairness would be served by this [c]ourt exercising supplemental jurisdiction over [p]laintiff's state law claims, and to do so would be inconsistent with the principle of comity.").

Because the court raises the issue of whether to exercise supplemental jurisdiction *sua sponte*, and the parties have not yet had an opportunity to brief it, the court will allow them twenty (20) days to do so before ruling on the issue.

## CONCLUSION

For the reasons stated above, the court GRANTS Defendants' motions for summary judgment (Docs. 42 and 43) as to Plaintiff's § 1983 claims. The parties are hereby GRANTED twenty (20) days from the date of this Order to submit memoranda as to the propriety of the court's exercising supplemental jurisdiction over Plaintiff's remaining state law claims.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 25th day of May, 2012.

*/s/ Christina Reiss*

Christina Reiss, Chief Judge
United States District Court