U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 NOV 28  PM 3: 03

CLERK

BY ___~~PC~~___
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

DANA MACLEOD,                          )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )        Case No. 5:10-cv-286
                                       )
TOWN OF BRATTLEBORO and                )
CHAD EMERY,                            )
                                       )
            Defendants.                )

**OPINION AND ORDER GRANTING DEFENDANT
TOWN OF BRATTLEBORO'S MOTION FOR SUMMARY
JUDGMENT AND GRANTING
DEFENDANT CHAD EMERY'S MOTION
FOR SUMMARY JUDGMENT**
(Docs. 42 & 43)

Before the court are renewed motions for summary judgment (Docs. 42 & 43),
filed by Defendants Brattleboro Police Officer Chad Emery and the Town of Brattleboro
(the "Town"), seeking judgment as a matter of law in their favor with regard to Plaintiff
Dana MacLeod's state law claims. Plaintiff opposes these motions.

Plaintiff initially brought this action under 42 U.S.C. § 1983, claiming that Officer
Emery violated his constitutional rights when Officer Emery allegedly used excessive
force in the course of Plaintiff's arrest. By Opinion and Order dated May 25, 2012, the
court dismissed Plaintiff's federal claims. *See MacLeod v. Town of Brattleboro*, 2012
WL 1928656 (D. Vt. May 25, 2012). Thereafter, the parties jointly requested the court to
retain supplemental jurisdiction and adjudicate the pending state law claims. The court
has agreed to do so.[1]

---

[1] This case has been pending in this court since November 24, 2010 and the parties have already
completed discovery and have engaged in extensive motion practice. The case does not involve
questions of first impression under Vermont law or complex state law issues and this court is

Plaintiff alleges claims of assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent use of a Taser device against Officer Emery. Against the Town, Plaintiff alleges vicarious liability for the acts of Officer Emery and negligent training and supervision.

Plaintiff is represented by Thomas W. Costello, Esq. and J. Eric Anderson, Esq. Officer Emery is represented by James F. Carroll, Esq. The Town is represented by Nancy G. Sheahan, Esq.

## I.    Undisputed Facts.

In setting forth the undisputed facts, the court considers only those facts relevant to Plaintiff's state law claims. Many of these facts have been adopted verbatim from the court's previous Opinion and Order. *See MacLeod*, 2012 WL 1928656, at *1-3. In determining whether a fact is disputed, the court does not consider Plaintiff's challenges to facts that are not supported by references to the evidentiary record. *See D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations, nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."). In conjunction with its review of the case, and with the parties' consent, the court has reviewed two cruiser videotapes of the events in question.

On September 27, 2009, between 7:00 and 8:00 p.m., Plaintiff was visited at his apartment by Brandon Theriault and another individual. Plaintiff admits he smoked marijuana prior to their arrival and consumed five or six rum and cokes between 6:00 p.m. and 10:00-11:00 p.m. Plaintiff's friends left Plaintiff's apartment at approximately 10:00 or 10:30 p.m. Thereafter, Plaintiff went to sleep.

On September 28, 2009, at approximately 2:30 or 3:00 a.m., Mr. Theriault returned to Plaintiff's apartment and awakened Plaintiff. After talking and playing video games, Plaintiff agreed to drive Mr. Theriault to McDonald's in Plaintiff's vehicle. Plaintiff drove while under the influence of alcohol.

---

already familiar with the facts, the claims, and the defenses. Accordingly, at this juncture, this court is the most efficient and expeditious forum for the adjudication of this lawsuit.

At approximately 5:30 a.m., Brattleboro Police Officer Adam Belville observed Plaintiff's vehicle exceeding the posted speed limit. It was still dark outside, and the streets were wet. Officer Belville was operating a fully marked police cruiser when he activated the cruiser's lights, signaling for Plaintiff to stop his vehicle. Plaintiff initially did so, pulling over to the side of the highway. Officer Belville exited his cruiser. As he approached the rear operator's side of Plaintiff's vehicle, the vehicle pulled quickly away from the stop. When it did so, it was approximately a foot away from Officer Belville's body.

Officer Belville ran back to his cruiser, entered it, radioed that he was in a pursuit, and requested assistance. Officer Emery, who was at the Brattleboro Police Department at the time, activated the recording equipment on his cruiser and drove to the area of pursuit.

As he fled the scene of the stop, Plaintiff travelled at speeds in excess of the posted speed limit through three intersections, two of which were marked with flashing yellow caution lights. Officer Belville pursued Plaintiff with his cruiser's lights and sirens activated for a distance of approximately 1.2 miles. At an intersection with a traffic light, Plaintiff drove through a red light. Other motorists were on the road at this time. Thereafter, Plaintiff pulled into the parking lot of a Wendy's restaurant, drove to the back side of the restaurant, stopped, and turned off his vehicle's engine. As Officer Belville pulled into the parking lot, Mr. Theriault immediately exited Plaintiff's vehicle and began to walk away from the vehicle. Plaintiff exited the vehicle as well, locked it, and put his keys into his right front pocket.

Officer Belville drew his firearm, pointed it at Plaintiff, and yelled commands for him to get down on the ground. Mr. Theriault immediately got into a prone position on the ground. Plaintiff did not do so, although he got into a kneeling position.

Officer Emery arrived on the scene and observed what was transpiring. At this point, Officer Belville's voice was high pitched and could accurately be described as a scream, and Plaintiff was on his hands and knees, with his back to the officers and his hands facing away from them. Within moments of Officer Emery's arrival, Plaintiff

3

struggled to get up on his feet, moving his arms to his side, and then quickly bringing them to the front of his body near his waist. Plaintiff put his right hand on the rear driver's side bumper of his vehicle and stood up. He turned around and appeared unsteady on his feet, leaning back against his vehicle.

As Plaintiff stood up, from a distance of approximately fifteen feet, both officers repeatedly yelled commands at Plaintiff to get on the ground. Plaintiff saw both officers pointing their guns at him and heard their commands. Plaintiff moved his arms to an open position from his sides and asked the officers, "What?" In doing so, Plaintiff appeared confused and continued to be unsteady on his feet.

The officers instructed Plaintiff to get on the ground several additional times. Plaintiff remained noncompliant with these commands. Officer Emery holstered his firearm, took out his Taser, aimed it at Plaintiff, and ordered him to get on the ground. Plaintiff did not do so and stood facing the officers with his hands in view. Officer Emery then yelled "Taser, Taser, Taser." Officer Emery deployed his Taser during or immediately after his third announcement of "Taser."

Approximately seventeen seconds elapsed between the time Officer Emery exited his cruiser and his deployment of the Taser. At the time of the Taser's deployment, the officers had not searched Plaintiff, his vehicle, or Mr. Theriault.

At some point after the tasing, Lieutenant Chuck Aleck, the shift supervisor, arrived on the scene. He made comments to the effect of: "Hey, how do you like the Taser? Good. Outstanding." It is not clear to whom these comments were directed. Plaintiff does not recall Lieutenant Aleck talking to him, although he does remember his presence at the scene. Plaintiff did not overhear any conversation between the officers.

One Taser probe struck Plaintiff in the left abdomen, and the other in his left chest area. The Taser was activated for approximately five seconds. Plaintiff did not lose consciousness but testified at a deposition that it "hurt a great deal, I lost all ability to stand up, initially it felt like a heart attack." (Doc. 44-1 at 65.) As Plaintiff was being tased, Officer Belville holstered his firearm and ran forward to take control of Plaintiff. At the end of the five second cycle, Officer Belville pulled Plaintiff to the ground,

handcuffed him, and rendered assistance.  As Plaintiff sat handcuffed on the pavement, Officer Emery told him "Do not move or you're gonna get it again.  Do not move."

Thereafter, Plaintiff was transported to a local hospital for removal of the probes by a medical professional.  The removal caused Plaintiff significant pain that lasted approximately fifteen to twenty seconds.  Each time Plaintiff's vital signs were taken at the hospital, Plaintiff reported his pain level was zero (meaning no pain).  After Plaintiff left the hospital, he was transported to the Brattleboro Police Department where he submitted to an alcosensor test that revealed a blood alcohol content of .22% at approximately 8:30 a.m.

A Taser X26 was employed in this incident.  When it is deployed at a subject, it propels a pair of barbed probes which are connected to the Taser by thin insulated wires.  Upon contact with the subject, the Taser X26 delivers a high voltage charge which overrides the subject's central nervous system and causes uncontrollable muscle contractions, thus temporarily incapacitating the subject.  Tasing generally does not result in permanent injury.

In February 2008, the Brattleboro Police Department issued new policies, procedures, and rules related to the use of force (the "Use of Force Policy" or the "Policy"), which specifically addressed the use of Tasers.[2]  The stated purpose of the Use of Force Policy "is to provide Law Enforcement Officers of the Brattleboro Police Department with guidelines, restrictions and post-incident procedures for the use of force."  (Doc. 44-15 at 2.)  Each new Brattleboro police officer is required to review the Use of Force Policy, and all officers are required to review it annually.  The Policy states that:

> It is the policy of the Brattleboro Police Department that officers will use only the reasonable force necessary to control a situation, effect an arrest or detention, overcome resistance or defend themselves or others from physical harm or to accomplish a legal purpose. The degree of force used will depend on what the officer perceives as reasonable and necessary and

---

[2] The Use of Force Policy defines a "Taser" as "[a]n Electronic Control Device that uses an electrical pulse which will temporarily incapacitate a subject." (Doc. 44-15 at 3.)

> which another reasonably prudent officer would use under the same or
> similar circumstances. Officers are expected to make an objectively
> reasonable choice from among the force options, based on the facts and
> circumstances known to them at the time.

(Doc. 44-15 at 2.)  The Policy further states that:

> An officer is justified in using non deadly force upon another person/s
> when and or to the extent that he/she reasonable believes it necessary to
> control a situation, effect an arrest or detention, overcome resistance or
> defend themselves or others from physical harm or to accomplish a legal
> purpose.  Brattleboro Police Officers will use only the force necessary and
> appropriate to gain and maintain compliance or control of a suspect and the
> force should be stopped once the compliance or control has been achieved,
> or the legal purpose accomplished.

*Id.* at 4. The Policy adopts a "circular use of force continuum model" which "is one that

places the officer in the center of a circle with all of the force options equally available."

*Id.* at 5.

The Use of Force Policy addresses Tasers in a section entitled "Immobilization"

which provides that "[i]mmobilization of a suspect may be accomplished with Physical

Force such as counter joint techniques, Chemical Irritants/sprays, Tasers or empty handed

impact techniques." *Id.* This part of the Use of Force Policy further provides that

"[i]mmobilization may be appropriate when a suspect becomes actively resistant or

aggressive or there is reasonable fear for the safety of the suspect, the officer or others.

Note the special requirements with respect to Tasers found in Section VI [B]." *Id.*

Section VI B of the Policy provides that:

Tasers may be used in the following circumstances:

1. To defend the officer or third party from what is reasonably believed to
   be an immediate threat of physical injury.

2. To prevent the commission of a suicide or self-inflicted serious physical
   injury.

3. To deter vicious or aggressive animals that threaten[] the safety of the
   officer or others.

*Id.* at 7.  Section VI B of the Use of Force Policy also enumerates when a Taser should not be used and provides:

> Tasers should not be used, either through the use of a shot probe or through Drive Stun mode:
>
> 1.  Punitively;
> 2.  As a prod or escort device;
> 3.  To rouse an unconscious, impaired or intoxicated individual[];
> 4.  Against any person displaying passive resistance;
> 5.  Absent exigent circumstances, against a handcuffed or restrained individual.

*Id.*

The Use of Force Policy states that, "[p]assive [r]esistance . . . is the preliminary level of citizen non-compliance.  Here the subject, although [non-compliant], offers no physical or mechanical energy enhancement towards the resistance effort." *Id.* at 5.  The Use of Force Policy further explains that "[t]he degree of force used will depend on what the officer perceives as reasonable and necessary and which another reasonably prudent officer would use under the same or similar circumstances." *Id.* at 2.  It contemplates that officers will consider multiple factors "[w]hen determining the level or degree of force that is reasonable," including:

> a.  The existence of alternative methods of control i.e. verbal commands, officer presence, or additional presence.
>
> b.  Circumstances that may determine whether an officer escalates or deescalates the level of force include many factors, not limited to the following: Level of resistance, Officer and Suspects age, size, skill levels, number of suspects, instrumentalities, proximity to weapons, prior experience and knowledge of suspect, location of encounter and background or peripheral hazards and Officer injury/exhaustion.
>
> c.  Officer/s will take into consideration the length of encounter and ability to continue.  Officers are not required to use or consider alternatives that increase danger to themselves or to others.
>
> d.  An officer is not required to retreat from the use of force when seeking to make an arrest or prevent escape.
>
> e.  Any force options used must be both reasonable and necessary and as soon as resistance has ceased and the person is in secure custody,

> the use of force must cease.  Force must never be used to punish a
> prisoner for resisting, or as a response to verbal insults and may only
> be used to accomplish lawful objectives.

*Id.* at 6.

Although Plaintiff contends that use of a Taser constitutes "deadly force," the Use of Force Policy does not make that point clear,[3] and courts have found otherwise.[4]

After the Brattleboro Police Department's adoption of the Use of Force Policy, firearms instructors conducted trainings for Brattleboro police officers regarding the use of Tasers in conjunction with the use of other nondeadly force and immobilization techniques.[5]  In these trainings, officers were instructed that the first three instances listed in the Use of Force Policy, which describe when an officer *may* use a Taser, were not the sole circumstances where use of a Taser may be justified.  All Brattleboro police officers are trained in the use of a Taser and are not eligible to carry one until completion of Taser training.  At the time of the incident, Officer Emery had completed the training and was certified to operate a Taser.

The Brattleboro Police Department has a policy which requires its officers to submit a Response to Aggression or Resistance report whenever an officer uses force. The Department also has a Taser Deployment Form to be used whenever a Taser is

---

[3]  The Use of Force Policy defines "Deadly Force" as "[p]hysical force which a person uses with the intent of causing, or which the person knows or should have known would create a substantial risk of causing, death or serious bodily injury." (Doc. 44-15 at 3.)  It defines "Non-Deadly Force" as "[a]ny force employed which is neither likely nor intended to cause death or serious physical injury.  This includes any physical effort used to control or restrain another, or to overcome resistance or immobilize a subject." *Id.*  The Policy defines "Serious Bodily Injury" to mean a "bodily injury which creates any of the following i) a substantial risk of death[;] ii) a substantial loss or impairment of the function of any bodily member or organ; iii) a substantial impairment of health; or iv) substantial disfigurement; or strangulation[.]" *Id.*

[4]  *See Towsley v. Frank*, 2010 WL 5394837, at *8 (D. Vt. Dec. 28, 2010) ("Using the X26 Taser has been described as a 'more than non-serious or trivial use of force but less than deadly force[.]'" (quoting *Mattos v. Agarano*, 590 F.3d 1082, 1087 (9th Cir. 2010)).

[5]  Pursuant to the Use of Force Policy, use of a Taser is an immobilization technique, which "may be appropriate when a suspect becomes actively resistant or aggressive or there is reasonable fear for the safety of the suspect, the officers or others." (Doc. 44-15 at 5.)

unholstered, displayed, or deployed. The Response to Aggression or Resistance reports are reviewed by supervisors and ultimately by the Chief of Police.

In this case, Officer Emery prepared a Response to Aggression or Resistance report and completed a Taser Deployment Form. Captain Mike Fitzgerald of the Brattleboro Police Department reviewed the report as did Chief of Police Gene Wrinn.

At the time of the incident, Officers Emery and Belville were certified by the Vermont Criminal Justice Training Council ("VCJTC") as full-time police officers in the State of Vermont. VCJTC is an agency created by Vermont statute to establish the standards for certification of full and part-time law enforcement officers and, in conjunction with that certification, provides basic training, including training in the proper use of force, including how to conduct a high-risk motor vehicle stop.

The Town has been a member of the Vermont League of Cities and Towns Property and Casualty Intermunicipal Fund, Inc. ("VLCT PACIF") at all times pertinent to this lawsuit. VLCT PACIF was created pursuant to 24 V.S.A. § 4942, which allows two or more municipalities, by resolution of their governing bodies, to enter into agreements for self-insurance. The coverage that VLCT PACIF affords the Town excludes any loss or damage arising out of, or in connection with, the performance of governmental functions by members to which sovereign immunity applies.

## II.     Disputed Facts.

Plaintiff disputes Defendants' characterization of many of the events depicted on the videotapes. As the court has based the undisputed facts on its own review of the videotapes, it need not adopt either party's version of those events.

Plaintiff disputes Officer Emery's claim that he believed Plaintiff was actively resisting and posed an immediate threat of physical injury to both Officer Emery and Officer Belville at the time of the incident, although he concedes Officer Emery testified to holding such beliefs. As Officer Emery's subjective beliefs are not at issue in deciding whether qualified immunity is available to him, this dispute does not preclude summary judgment.

Plaintiff disputes the Town's calculation of the amount of electrical current delivered by a Taser and contends that both the Town and the Taser's manufacturer substantially underestimate the amount of electrical current that enters a subject's body and the effects therefrom. Plaintiff also disputes the Town's assertions that it extensively supervises both probationary and permanent police officers, and that its training meets or exceeds VCJTC standards. The court will regard these disputed facts in the light most favorable to Plaintiff and determine whether they are material in deciding Plaintiff's claims against the Town.

## III.   Conclusions of Law and Analysis.

Officer Emery argues that he is entitled to summary judgment because the undisputed evidence demonstrates that Plaintiff cannot prove the essential elements of the state law torts he alleges. In the alternative, he asserts that summary judgment must be granted in his favor because he is entitled to qualified immunity. In support of his qualified immunity defense, Officer Emery argues that he was engaged in a discretionary function during the course of his employment and that a reasonable officer would not believe his actions violated Plaintiff's clearly established rights.

Plaintiff responds that Officer Emery's motion for summary judgment should be denied because a rational juror, viewing the facts in the light most favorable to Plaintiff, could find that Officer Emery's actions clearly violated the Use of Force Policy, and therefore a reasonable officer would have known that such actions violated Plaintiff's clearly established rights.

The Town seeks summary judgment in its favor, arguing that sovereign immunity immunizes it from liability for Plaintiff's claims because the training and supervising of police officers which Plaintiff alleges is inadequate is a governmental function. Plaintiff contends that sovereign immunity is not applicable because the Town's functions in this case were proprietary, not governmental.

### A.   Standard of Review.

Summary judgment must be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

10

law. Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In deciding the motion, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party and deny the motion if a rational juror could decide in favor of that party under the applicable law. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before the court." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993).

To avoid summary judgment, the nonmoving party must offer more than "mere speculation and conjecture[,]" *Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001), as the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

In assessing whether there are triable issues of fact, the court may rely on facts as depicted in an unaltered videotape and audio recording, even when such facts contradict those claimed by the nonmoving party. *See Scott*, 550 U.S. at 379-81 (relying on video recording of police chase even though it contradicted the nonmoving party's version of the material facts).

### B.    Whether the Elements of the Alleged Torts are Satisfied.

As a threshold matter, the court must determine whether Plaintiff has adduced sufficient evidence to establish the essential elements of his claims. Plaintiff asserts the following tort claims against Officer Emery: assault and battery; intentional infliction of

emotional distress; negligent infliction of emotional distress; and negligent use of a Taser device.  To survive summary judgment, he must adduce admissible evidence in support of each essential element of his claims.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Catrett*, 477 U.S. at 322-23.  In such cases, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.*

### 1.    Assault and Battery.

"At common law, the civil tort of assault is defined as 'any gesture or threat of violence exhibiting an [intention] to assault, with the means of carrying that threat into effect . . . unless immediate contact is impossible.'" *Billado v. Parry*, 937 F. Supp. 337, 343 (D. Vt. 1996) (quoting *Bishop v. Ranney*, 7 A. 820, 821 (Vt. 1887)).  Under Vermont law, battery is "an intentional act that results in harmful contact with another." *Christman v. Davis*, 2005 VT 119, ¶ 6, 179 Vt. 99, 101, 889 A.2d 746, 749.

Officer Emery intentionally drew his Taser and pointed it at Plaintiff.  Officer Emery then threatened Plaintiff with use of the Taser initially when he shouted "Taser, Taser, Taser," (Doc. 44 at ¶ 75) and again, after the tasing, when he stated "[d]o not move or you're gonna get it again." *Id.* at ¶ 92.  Officer Emery's unholstering of the Taser and announcement of his intention to utilize it demonstrated a clear intent to deploy the Taser against Plaintiff and the means to do so.  He was a relatively short distance away from Plaintiff such that deployment of his Taser could and did result in immediate contact with Plaintiff.  Plaintiff described his alleged injury from the tasing as follows: "It hurt a great deal, I lost all ability to stand up, initially it felt like a heart attack." (Doc. 44-1 at 65.) Plaintiff has thus satisfied the essential elements of the torts of assault and battery for purposes of summary judgment.

12

## 2. Intentional Infliction of Emotional Distress.

A claim for intentional infliction of emotional distress under Vermont law requires a showing that "defendant[] engaged in 'outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct.'" *Fromson v. State*, 2004 VT 29, ¶ 14, 176 Vt. 395, 399, 848 A.2d 344, 347 (quoting *Sheltra v. Smith*, 392 A.2d 431, 433 (Vt. 1978)). "Plaintiff's burden on this claim is a 'heavy one' as he must show defendant['s] conduct was 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable.'" *Id.* (quoting *Dulude v. Fletcher Allen Health Care, Inc.*, 807 A.2d 390, 398 (Vt. 2002)). Whether a jury could reasonably find that Officer Emery's tasing of Plaintiff was so outrageous and extreme as to go beyond all possible bounds of decency is initially a question of law for the court. *See Jobin v. McQuillen*, 609 A.2d 990, 993 (Vt. 1992) ("It is for the court to determine as a threshold question whether a jury could reasonably find that the conduct at issue meets the test").

Plaintiff alleges that Officer Emery's use of the Taser was outrageous and extreme, causing "[excruciating] pain and total body paralysis." (Doc. 47 at 36.) Applying Vermont law, this court has found that tasing individuals who had chained themselves to a barrel and refused to unchain themselves did not satisfy the elements of intentional infliction of emotional distress. *See Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 416 (D. Vt. 2009) (rejecting the plaintiff's claim of intentional infliction of emotional distress because the officers acted reasonably in tasing noncompliant suspects in order to effect their arrests), *aff'd*, 400 F. App'x 592 (2d Cir. 2010).

Here, Officer Emery encountered Officer Belville holding two suspects at gunpoint, and Plaintiff not only refused to comply with orders, but stood up upon Officer Emery's arrival. This court has found that Officer Emery's use of force was reasonable under the circumstances and constituted a de-escalation in the officers' show of force. *See MacLeod*, 2012 WL 1928656, at *8. It would be inconsistent to conclude that

13

Officer Emery's conduct was both reasonable and "outrageous in character and . . . extreme in degree." *Dulude*, 807 A.2d at 398.

No rational juror could find, based on the undisputed facts, that Officer Emery's decision to tase Plaintiff was "so outrageous and extreme as to 'go beyond all possible bounds of decency.'" *Jobin*, 609 A.2d at 993 (quoting *Demag v. Am. Ins. Co.*, 508 A.2d 697, 699 (Vt. 1986)). Accordingly, Officer Emery's use of the Taser did not rise to the level of intentional infliction of emotional distress, and this claim must be dismissed. Summary judgment is therefore GRANTED to Officer Emery and the Town on Plaintiff's intentional infliction of emotional distress claim.

### 3. Negligent Use of a Taser/Negligent Infliction of Emotional Distress.

Plaintiff's negligent use of a Taser and negligent infliction of emotional distress claims overlap to some extent in terms of their essential elements.[6]  Both claims require that Plaintiff satisfy the essential elements of a negligence claim. "The elements of common law negligence are: (1) defendants owed a legal duty to protect plaintiff from an unreasonable risk of harm; (2) defendants breached that duty; (3) defendants' conduct was the proximate cause of plaintiff['s] injuries; and (4) plaintiff[] suffered actual damage." *Knight v. Rower*, 742 A.2d 1237, 1242 (Vt. 1999). In order to establish a claim of negligent infliction of emotional distress, a plaintiff must also show that "[plaintiff] or someone close to him faced physical peril." *Brueckner v. Norwich Univ.*, 730 A.2d 1086, 1092 (Vt. 1999). If a plaintiff suffered a physical impact, then he or she "may recover for emotional distress stemming from the incident during which the impact occurred." *Id.*

---

[6] Officer Emery questions whether "a negligence claim premised on an alleged excessive application of force exists distinct from its assault and battery counterpart." (Doc. 43-1 at 22 n.9) (citing *City of Miami v. Sanders*, 672 So.2d 46, 48 (Fla. Dist. Ct. App. 1996) ("We come to the inescapable conclusion that it is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of an 'intentional' tort.")). Here, the court need not decide whether Vermont law would recognize such a claim as Plaintiff is clearly entitled to plead in the alternative.

The question of whether "a duty exists upon which liability may be claimed is a matter of law to be decided by the [c]ourt." *Edson v. Barre Supervisory Union No. 61*, 2007 VT 62, ¶ 9, 182 Vt. 157, 160, 933 A.2d 200, 203. Plaintiff asserts that the Use of Force Policy imposes a duty on Officer Emery relating to his use of a Taser. The Vermont Supreme Court has articulated four factors which are "useful indicia in determining whether a governmental body has undertaken a duty of care toward certain persons," including:

> (1) whether an ordinance or statute sets forth mandatory acts clearly for the protection of a particular class of persons, rather than the public as a whole; (2) whether the government has actual knowledge of a condition dangerous to those persons; (3) whether there has been reliance by those persons on the government's representations and conduct; and (4) whether failure by the government to use due care would increase the risk of harm beyond its present potential.

*Denis Bail Bonds, Inc. v. State*, 622 A.2d 495, 499 (Vt. 1993) (citation omitted).

The Use of Force Policy contains most, if not all, of the identified hallmarks of a governmental duty. First, it sets forth prohibitions on the use of Tasers in certain circumstances that are clearly designed to protect suspects and others who interact with the police from the danger that Tasers present.[7] Although the Use of Force Policy is also intended to protect the general public, it is specifically directed to police encounters with certain members of the public as opposed to use of Tasers against the public at large.

Second, in developing the Use of Force Policy, the Town had actual knowledge that a Taser creates a danger of physical harm to those individuals upon whom it is used.

---

[7] In *Kane v. Lamothe*, 2007 VT 91, 182 Vt. 241, 936 A.2d 1303, the Vermont Supreme Court noted that a police manual that had not been adopted as a rule pursuant to Vermont's Administrative Procedure Act, "lacks the authority of a statute or regulation" and "[o]ur test of whether a specific duty exists asks 'whether a *statute* sets forth mandatory acts for the protection of a particular class of persons.' Generally, internal policies and manuals provide preferred standards but not legal requirements for which individuals may hold the State liable." *Id.* at ¶ 11, 182 Vt. at 247, 936 A.2d at 1309 (internal citation omitted). Without overruling *Kane*, the court in *Kennery v. State*, 2011 VT 121, 38 A.3d 35, relied upon "a common law duty of care under Restatement (Second) of Torts § 324A," *Id.*, at ¶ 11, 38 A.3d at 39, and concluded that the first prong of the *Denis Bail Bonds* test was met. *Id.* at ¶ 25, 38 A.3d at 43-44. This prompts the court to conclude that a statute or regulation is not required, and an official governmental policy will suffice.

The Use of Force Policy, itself, reflects this knowledge and seeks to limit the circumstances in which Tasers may be used, as well as to provide guidance in those circumstances in which they are authorized.

Third, suspects, including Plaintiff, have a right to reasonably rely on the Use of Force Policy as governing when a Taser may be deployed, although it would be difficult in this case to establish any actual reliance on governmental representations and conduct.

And finally, because the Town arms its police officers with Tasers, a failure to use due care in developing and enforcing policies related to the use of Tasers may increase the risk of harm associated with them beyond their present potential. The Use of Force Policy seeks to circumscribe the use of Tasers so that their potential for harm is not expanded beyond those circumstances in which the Town has deemed a use of force permissible.

For the foregoing reasons, the court concludes that the Use of Force Policy creates a duty of care on behalf of both the Town and Officer Emery which governs the use of a Taser against suspects such as Plaintiff. *See Kennery v. State,* 2011 VT 121, ¶ 28, 38 A.3d 35,44 (finding common law duty of care sufficient to satisfy *Denis Bail Bonds* test); *Sabia v. State,* 669 A.2d 1187, 1192 (Vt. 1995) (citing statutory provisions requiring investigation of reports of child abuse, and finding "it is beyond dispute that the relevant statutory provisions create a duty on the part of SRS to assist a particular class of persons to which plaintiffs belong and to prevent the type of harm suffered by plaintiffs."). Plaintiff must next proffer admissible evidence that Officer Emery breached that duty of care.

"Where the law has settled no rule of diligence, negligence is ordinarily a question for the jury and it is a fact to be inferred from the attending circumstances. It can be ruled as a matter of law only, where the facts are undisputed and are so conclusive that but one reasonable inference can be drawn therefrom." *LaFaso v. LaFaso,* 223 A.2d 814, 819 (Vt. 1966); *see also Thurber v. Russ Smith, Inc.,* 260 A.2d 390, 392 (Vt. 1969) ("Whether there was a breach of this duty . . . is a matter subject to proof by evidence."); *Garafano v. Neshobe Beach Club, Inc.,* 238 A.2d 70, 76 (Vt. 1967) (finding that

16

questions regarding the level of care exercised "were clearly for resolution by the jury");
*Latremouille v. Bennington & R. R. Co.*, 22 A. 656, 658 (Vt. 1891) (explaining that
negligence is "a mixed question of law and fact, always, under the decisions of this state,
to be submitted to the jury").

Officer Emery asks the court to find as a matter of law that he did not breach the
duty of care, noting that the Use of Force Policy recognizes that a Taser may be used to
"immobilize" a suspect and that "[u]nder Vermont law, public officials are privileged to
use such force as is reasonably necessary to accomplish a lawful purpose." (Doc. 43-1 at
21) (quoting *Robison v. Via*, 821 F.2d 913, 927 (2d Cir. 1987)).

Plaintiff counters that a rational juror could find that he was engaged in "passive
resistance" when he was tased which, in turn, would constitute a violation of the Use of
Force Policy which states that a Taser "should not be used . . . [a]gainst any person
displaying passive resistance[.]" (Doc. 44-15 at 7.) Because the Town drafted the Use of
Force Policy, and thus was free to define its terms, Plaintiff contends that any ambiguity
in the Policy's definition of "passive resistance" should be construed against the Town.

The Use of Force Policy states that passive resistance occurs when "the subject,
although [noncompliant], offers no physical or mechanical energy enhancement towards
the resistance effort." *Id.* at 5. It is beyond dispute that Plaintiff was noncompliant with
law enforcement orders. *See MacLeod*, 2012 WL 1928656, at *6-7. Plaintiff, however,
argues that he did not use any "physical or mechanical energy enhancement[s]." (Doc.
44-15 at 5.) For example, he did not display a weapon, adopt a fighting stance, throw a
projectile, or make any other show of force. Instead, the attitude he displayed was one of
obvious confusion. In light of this evidence, Plaintiff contends a rational juror could
conclude that Plaintiff's noncompliance with police orders was accompanied only by
"passive resistance," and, therefore, tasing Plaintiff breached the duty set forth in the Use
of Force Policy. In order to reach a contrary conclusion, the court would have to find that
no rational juror could find in Plaintiff's favor on this element. *See Commander Oil
Corp.*, 991 F.2d at 51; *see also Hardingham v. United Counseling Service of Bennington
County, Inc.*, 672 A.2d 480, 483 (Vt. 1995) (where an issue is "'generally a question for

the jury,' the trial court may decide the question as a matter of law 'where the minds of reasonable persons cannot differ.'") (quoting *Rivard v. Roy*, 196 A.2d 497, 500 (Vt. 1963)).  Here, the court cannot reach that conclusion.

Because Plaintiff's alleged injuries resulted from a physical impact that was proximately caused by Officer Emery's claimed breach of the Use of Force Policy, Plaintiff has satisfied the remaining essential elements of his negligence claims for purposes of summary judgment.  The court must next evaluate whether Officer Emery is nonetheless entitled to summary judgment on the basis of qualified immunity.

### C.    Whether Officer Emery Is Entitled to Qualified Immunity.

Officer Emery asserts that summary judgment in his favor is mandated with respect to Plaintiff's remaining state law claims because he is entitled to qualified immunity under Vermont law. *See Napolitano v. Flynn*, 949 F.2d 617, 621 (2d Cir. 1991) ("[T]he substantive law of Vermont governs the applicability of qualified immunity to [plaintiff's] state law claims[.]") (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).  Once the issue of qualified immunity is raised, Vermont law imposes upon the plaintiff "the burden to rebut the qualified immunity defense 'by establishing that the official's allegedly wrongful conduct violated clearly established law.  We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs.'" *Sprague v. Nally*, 2005 VT 85, ¶ 4 n.3, 178 Vt. 222, 225 n.3, 882 A.2d 1164, 1167 n.3 (quoting *Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997)); *but see Lore v. City of Syracuse*, 670 F.3d 127, 149, 166 (2d Cir. 2012) (considering both federal and New York's qualified immunity law and ruling that "a defendant has the burden of proof with respect to affirmative defenses, and qualified immunity is such a defense[.]").

Under Vermont law, a public official is entitled to qualified immunity if he or she is "(1) acting during the course of [his or her] employment and acting, or reasonably believing [he or she is] acting, within the scope of [his or her] authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial acts." *Murray v. White*, 587 A.2d 975, 978 (Vt. 1991).  The Vermont Supreme Court has encouraged the

18

trial courts to decide qualified immunity claims at the summary judgment stage. *Id.* ("Reliance on the objective reasonableness of an official's conduct . . . [should] permit the resolution of many insubstantial claims on summary judgment" and "[t]he desire . . . to promote summary judgment resolution of qualified immunity claims is consistent with the perception that qualified immunity is indeed an immunity from the suit itself, not just a defense to ultimate liability.") (internal citations omitted).

It is undisputed that Officer Emery was acting during the course of his employment when he tased Plaintiff and he has testified that he believes that he was acting within the scope of his authority. The court must therefore decide whether that belief was reasonable, whether he acted in good faith, and whether he was performing a discretionary as opposed to a ministerial act.

Here, and perhaps in many cases, the issues of reasonableness and good faith dovetail to present a single question as to whether it was objectively reasonable for Officer Emery to believe that his conduct was consistent with the Use of Force Policy and not contrary to existing law. In *Murray v. White*, the Vermont Supreme Court adopted the United States Supreme Court's conclusion in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), that "good faith depends 'on the objective reasonableness of an official's conduct, as measured by reference to clearly established law.'" *Murray*, 587 A.2d at 978 (quoting *Harlow*, 457 U.S. at 818); *see also id.* at 981 ("We adopted *Harlow*'s objective test of good faith in an effort to strike the proper balance between allowing redress for the wronged and allowing 'public officials the freedom necessary to perform their obligations without fear of retaliation.'") (citation omitted). It thus found that:

> Good faith exists where an official's acts did not violate clearly established rights of which the official reasonably should have known. This good faith inquiry does not ask whether plaintiff's rights were violated, but rather whether the official reasonably should have known that what she was doing violated plaintiff's rights. As such, a lack of good faith is not established by asserting that the right to be free from the torts alleged in plaintiff's complaint is clearly established. Rather, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . [I]n light of pre-existing law the unlawfulness must be apparent."

*Murray*, 587 A.2d at 980 (internal citations and footnote omitted).

Vermont law does not specifically prohibit the use of Tasers to effectuate the arrest of a noncompliant suspect that may pose a risk of harm to law enforcement officers or the public. To the contrary, as previously noted, the Second Circuit has observed that "[i]t appears that under Vermont law, public officials are privileged to use such force as is reasonably necessary to accomplish a lawful purpose." *Robison*, 821 F.2d at 926-27 (citing *Chase v. Watson*, 56 A. 10, 11 (1903)). The Use of Force Policy purports to reflect this same authority, noting that "[a]n officer is justified in using non deadly force upon another person/s when and or to the extent that, he/she reasonably believes it necessary . . . to accomplish a legal purpose." (Doc. 44-15 at 4.) This court has concluded that using a Taser to effect Plaintiff's arrest was not unreasonable under the Fourth Amendment in the circumstances of this case. *See MacLeod*, 2012 WL 1928656, at *8. It has further found the use of a Taser constitutionally permissible even in the face of passive resistance. *See Crowell*, 667 F. Supp. 2d at 409 ("[U]sing a Taser as a last resort to effect the arrests of suspects who are resisting, who have repeatedly been given lawful orders with which they could have easily complied, and who received . . . warnings specifically about the use of [the Taser], is not unreasonable[.]"). Accordingly, the use of a Taser in the circumstances of this case was not prohibited by "settled, clearly-established law." *Czechorowski v. State*, 2005 VT 40, ¶ 23, 178 Vt. 524, 531, 872 A.2d 883, 893 (holding that "the test of a government actor's 'good faith' in this context requires that we measure the reasonableness of the conduct 'in relation to settled, clearly established law.'") (citation omitted).

On the other hand, the Second Circuit has held that:

> "Summary judgment should not be granted on the basis of a qualified immunity defense premised on an assertion of objective reasonableness unless the defendant 'show[s] that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law.'"

*O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (citing *Ford v. Moore*, 237 F.3d 156, 162
(2d Cir. 2001); *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999); *Lennon v. Miller*, 66
F.3d 416, 420 (2d Cir. 1995)).

Application of the Second Circuit's standard to this case reveals that regarding the
evidence in the light most favorable to Plaintiff, Plaintiff has established that he was
tased when he was engaged in conduct which arguably constituted "passive resistance."
Although not prohibited by Vermont law, under the Use of Force Policy, the tasing of a
suspect "displaying passive resistance" "should not" have taken place. (Doc. 44-15 at 7.)
Assuming arguendo that the right to be free of tasing when "displaying passive
resistance" reflected "clearly established rights," the court must further find that the
"unlawfulness" of Officer Emery's conduct would have been "apparent" to him. *Murray*,
587 A.2d at 981. Under Vermont law, "[a]n officer is protected from immunity unless
'no officer of reasonable competence could have made the same choice in similar
circumstances.'" *Muir v. Thibault*, 2011 WL 4975607, at *2 (Vt. Aug. 31, 2011)
(unpublished entry order) (quoting *Lennon*, 66 F.3d at 420-21); *see also Malley v. Briggs*,
475 U.S. 335, 341 (1986) (Under *Harlow*, qualified immunity is available if "officers of
reasonable competence could disagree" on the legality of defendant's actions).

In this case, officers of reasonable competence could disagree regarding whether
the use of a Taser was authorized for several reasons. First, the Use of Force Policy,
itself, appears to authorize the use of non-deadly force such as a Taser if a "reasonably
prudent officer" would find it reasonable to use such force to "control a situation" "effect
an arrest or detention," "overcome resistance," to "defend themselves or others from
physical harm" or to "accomplish a legal purpose." (Doc. 44-15 at 4.) Moreover, a
specific provision of the Use of Force Policy provides that "[i]mmobilization of a suspect
may be accomplished with . . . Tasers" if the officer concludes that resistance is "active"
or "aggressive" rather than "passive." (Doc. 44-15 at 5.) The Use of Force Policy further
provides that "[a]n officer is not required to retreat from the use of force when seeking to
make an arrest or prevent escape." (Doc. 44-15 at 6.) The Policy requires officers to
consider a multitude of factors in "determining the level or degree of force that is

reasonable" *id.*, which afford an officer a high degree of flexibility and discretion in determining whether to escalate or deescalate the use of force. It states that "all of the force options [are] equally available." (Doc. 44-15 at 5.)

Against this backdrop, reasonable officers could conclude that Tasers were generally permissible but "should not" (not shall not) be used when the suspect is "displaying passive resistance." Here, the ambiguity of the Policy's definition of "passive resistance" works in Officer Emery's favor as a reasonable officer could find that, in the context of an incident that started with a high speed chase and Plaintiff's driving away from a lawful stop in a way that placed Officer Belville's safety at risk, and in the face of repeated demands to get down on the ground, Plaintiff's abrupt standing up and movement towards his vehicle was either "aggressive" or a "physical . . . energy enhancement towards the resistance effort." (Doc. 44-15 at 5). Although this may not be the most reasonable characterization of Plaintiff's conduct at the time of the tasing, it is not objectively unreasonable, and reasonable officers could differ as to the nature of the resistance Plaintiff had displayed and was displaying.

Second, Officer Emery was faced with the need to immediately respond to a rapidly developing incident in which his fellow police officer was outnumbered by suspects who had previously led Officer Belville on a high speed chase which included driving away from him as he attempted to conduct a motor vehicle stop. As Officer Emery approached the scene, he observed Plaintiff remaining non-compliant in the face of a brandished firearm and lawful repeated commands, announced at the pitch of a scream, to get down on the ground. Officer Emery's decision to holster his own firearm and deploy a Taser constituted a de-escalation of force. His decision to use a Taser occurred in the context of what the Second Circuit has described as a "split-second decision," *O'Bert*, 331 F.3d at 37 (citation and quotation omitted), that would not have permitted him to consult the inherently conflicting provisions of the Use of Force Policy in order to determine whether his conduct was specifically authorized or specifically prohibited. Had he had that opportunity, it would not have been immediately "apparent" to him that his conduct was unauthorized. On this point, rational jurors could not differ

22

and, specifically, they could not find that "no officer of reasonable competence could have made the same choice in similar circumstances." *Muir*, 2011 WL 4975607, at *2.

Finally, the court has previously found Officer Emery's actions objectively reasonable as a matter of law for purposes of Plaintiff's federal claims. *See MacLeod*, 2012 WL 1928656, at *8. In doing so, the court implicitly found that the tasing in the circumstances of this case did not violate clearly established law. *Id.*; *see also Graham v. Connor*, 490 U.S. 386, 396 (1989) (holding that the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) ("In the circumstances of this case, Reynold's use of the taser gun to effectuate the arrest of Draper was reasonably proportionate to the difficult, tense and uncertain situation that Reynolds faced in this traffic stop, and did not constitute excessive force."); *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) ("If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him."). Considering the totality of the circumstances, "no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *O'Bert*, 331 F.3d at 37.

Having determined that Officer Emery acted in good faith and reasonably believed he was acting within the scope of his authority, the court must determine whether Officer Emery's actions took place in the context of a discretionary or ministerial function.

In *Kennery*, the Vermont Supreme Court revisited the discretionary versus ministerial distinction in the context of a claim of sovereign immunity. It adopted the two-part test set forth in *United States v. Gaubert*, 499 U.S. 315, 324 (1991). "Under the first prong of the test, a court must determine whether a statute, regulation, or policy mandates certain acts, or whether performance of a duty involves an element of judgment or choice." *Kennery*, 2011 VT 121 at ¶ 32, 38 A.3d at 45. "If a court determines that acts involve an element of judgment or choice, it must then decide 'whether that judgment is of the kind that the discretionary function exception was designed to shield.'"

*Id.* (citation omitted). "[T]he exception protects only governmental actions and decisions based on considerations of public policy." *Id.* (citation and internal quotation marks omitted). Because "even ministerial acts involve some element of discretion," courts are directed to engage in a case-by-case analysis. *Id.* at ¶ 33, 38 A.2d at 45. "[P]laintiff's role in a motion for summary judgment is to allege facts sufficient to support a finding that the challenged act is not the type of act protected by the exception." *Id.* at ¶ 33, 38 A.2d at 46 (citation and internal quotation marks omitted).

Officer Emery does not analyze whether he was engaged in a discretionary or ministerial act at the time of the incident but merely states "[a]s a governmental official exercising a discretionary function, Emery has a qualified immunity from MacLeod's federal and state damages claims." (Doc. 43-1 at 9.)

Plaintiff contends that Officer Emery's conduct was ministerial because he was operating under the Use of Force Policy, which he contends "dictated certain conduct with respect to the use of [T]asers -- unlike the previous use of force policy, there was no discretion given to officers regarding when they were allowed to use [T]asers." (Doc. 47 at 31-32.) In support of this claim, he cites excerpts from the Town Manager's comments made at a February 19, 2008 selectboard meeting which he claims "clarified the scope of the new [T]aser policy" and made it clear that the "Use of Force Policy was not an aspirational set of guidelines -- it was a clear restriction on the use of [T]asers, and Emery was operating under that restriction when he tased MacLeod." *Id.* at 32. Neither the Town nor Officer Emery has moved to strike Plaintiff's reference to this excerpt. Assuming the court may consider it, it nonetheless does not prove what Plaintiff seeks to prove. No party is contending that the Use of Force Policy is merely aspirational in nature. However, it is less clear that it "mandates certain acts" without affording a law enforcement officer considerable discretion and choice as to when, how, and whether they are carried out. The Policy specifically and repeatedly provides that the use of force involves an element of judgment or choice from among the array of available options. *See* Doc. 44-15 at 1 ("Officers are expected to make an objectively reasonable choice from among the force options, based on the facts and circumstances known to them at the

24

time."); *id.* at 5 ("A circular use of force continuum model is one that places the officer in the center of a circle with all of the force options equally available."); *id.* at 6 ("When determining the level or degree of force that is reasonable, an officer shall consider [five separate categories of factors.]").  A police officer confronted with a suspect who is failing to follow lawful commands even when faced with a brandished firearm is thus not presented with a dictated course of action to follow.  *See Amy's Enterprises v. Sorrell*, 817 A.2d 612, 617 (Vt. 2002) ("A discretionary function is an act which requires the exercise of judgment in its performance, or in the alternative, where there is no specifically dictated course of action for the employee to follow.").

Moreover, even when a statute, policy or common law imposes a duty of care, qualified immunity remains available if the act in question is one that involves "competing considerations based upon policy assessments." *Kennery*, 2011 VT 121 at ¶ 36, 38 A.3d at 46.  *Kennery* makes this distinction clear.  It addressed whether state troopers performing a welfare check on an elderly women were engaged in a discretionary function when they applied the information provided to them by the women's daughter but mistakenly checked the wrong house.  The Vermont Supreme Court opined that while many aspects of the troopers' activities were discretionary, performing at welfare check at the wrong house was not:

> We have no doubt that the VDPS decision to perform or not perform welfare checks is protected by the discretionary function exception. Further, state police officers must have discretion to decide whether to respond to a particular request in light of all the demands upon their on-duty time. . . . If plaintiff's claim were that the troopers waited too long in responding and the delay caused the result, we would similarly hold that the State must also be protected by the discretionary function exception because VDPS must be protected in its ability to allocate limited trooper time to competing demands. . . . The discretionary activity at issue was to apply the information given the officers to search the right house.  We see no public policy analysis in this activity.  Thus, we cannot conclude that the actions that are at the center of plaintiff's claims are protected by the discretionary function exemption.

*Kennery*, 2011 VT 121 at ¶¶ 35- 36, 38 A.3d at 46-47. The *Kennery* court compared the facts before it to those of *Carter v. United States*, 725 F. Supp. 2d 346 (E.D.N.Y. 2010), wherein the court addressed whether the Post Office's address verification services were a "discretionary function" when an employee made an error in transcribing research notes, which resulted in federal agents invading the wrong house. Observing that even though there was some discretion involved in transcribing the notes, the court concluded that those "choices were not policy-based," *id.* at 355, and the error was instead caused by "simple carelessness[.]" *Id.*

Here, if there was any error, it was an error in professional judgment not an error in carrying out a prescribed task. In this respect, this case clearly falls squarely within *Kane v. Lamothe*, 2007 VT 91, 182 Vt. 241, 936 A.2d 1303, not *Kennery*. The *Kennery* court, itself, recognized that difference:

> In *Kane*, an officer exercised his professional judgment not to arrest a domestic violence perpetrator, and the victim alleged that that omission was gross negligence. We concluded that even if the officer should have more thoroughly investigated the circumstances and exercised his discretion differently, the omission did not rise to gross negligence as a matter of law. *The main difference between this case and Kane lies in the nature and extent of the discretion involved. Kane involved the professional discretion, based upon training and experience, to determine whether arrest was the right remedy to the circumstances the officer encountered.* This case involves the very limited discretion to find the right house based on the instructions given by decedent's daughter.

*Kennery*, 2011 VT 121 at ¶ 42 n.4, 38 A.3d at 48 n.4 (emphasis supplied). Here, Officer Emery was confronted with a similar professional judgment: whether tasing was the right response to the behavior Plaintiff had engaged in and was displaying.

Plaintiff nonetheless contends that even if a police officer's discretion in carrying out an arrest is generally discretionary, here the Use of Force Policy removed that discretion and "it was only up to Emery to follow those guidelines. Since MacLeod was passively resisting, Emery had no discretion to tase him, especially since the purpose of tasing was to achieve compliance with his commands." (Doc. 47 at 35) (footnotes

omitted).  He contends that all policy decisions were made when the Use of Force Policy was adopted and thus nothing was left to the police officer's discretion or choice when it came to tasing a person engaged in "passive resistance."  The problem with this argument is twofold.

First, Plaintiff assumes that his "passive resistance" has been established when it has not.  Rather, in light of the Use of Force Policy's definition of that term, it would be a judgment call as to whether or not Plaintiff was engaged in "passive resistance" prior to his tasing.  The court has previously concluded that it could not find as a matter of law that Plaintiff was *not* engaged in "passive resistance."  It has further concluded that reasonable officers could differ as to whether he *was* engaged in "passive resistance." Moreover, although the Use of Force Policy states that Tasers "should not" be used when a suspect is "displaying passive resistance," (Doc. 44-15 at 7) it also states that Tasers *can be used* for "immobilization" when a suspect is displaying aggression or is "actively resistant."  *Id.* at 5.  Accordingly, the professional judgment in this case involved considerably more than simply following a prescribed guideline, transcribing the right information, or finding the right house.

Second, how a police officer responds to the decision of whether, when, and how to arrest a person has repeatedly been recognized in Vermont to be a quintessential discretionary function.  *See Kennery*, 2011 VT 121 at ¶ 42 n.4, 38 A.3d at 48 n.4 (recognizing a discretionary function in the "the professional discretion, based upon training and experience, to determine whether arrest was the right remedy to the circumstances the officer encountered."); *Amy's Enterprises*, 817 A.2d at 617 (explaining that: "This Court has previously held that decisions made in the course of investigations are discretionary" and that "[t]he investigation of potentially criminal conduct . . . requires substantial judgment in terms of means and manner, [and thus] the act of investigation is a discretionary one.").  This remains true even when a policy, regulation, or statute mandates a course of action.  *See Kane*, 2007 VT 91 at ¶ 10, 182 Vt. at 247, 936 A.2d at 1309 (ruling that "a police officer's decision to arrest, even under the Manual [which provided that an arrest was the "preferred response" to domestic violence], is

inherently discretionary"); *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760 (2005) ("A well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes."); *Leno v. Stupik*, 2008 WL 5412849, at *6 (D. Vt. Dec. 29, 2008) (finding police officer's decision whether to take a person into protective custody where statute mandated protective custody for a person who was "incapacitated" required exercise of judgment and was discretionary).

When he arrived on the scene, Officer Emery was faced with a number of competing considerations. He needed to balance law enforcement's interest in the arrest of a criminal suspect whose danger to the public was apparent from a high speed chase. He needed to consider officer safety in the context of a suspect who had already placed Officer Belville at risk, who was potentially armed, who was potentially under the influence of alcohol or drugs or both, and who might respond violently if the officers sought to manually take him into custody. Officer Emery further needed to consider the suspect's right to be free of excessive force when that same suspect was seemingly unfazed by brandished firearms. Deciding what level of force to use, if any, in these rapidly changing circumstances was precisely the type of policy determination that the Vermont Supreme Court has observed that qualified immunity is designed to protect:

> In determining whether qualified immunity applies to protect a particular public function or official, we are guided principally by 'the purposes behind' the doctrine. *Hudson v. Town of East Montpelier*, 161 Vt. 168, 172, 638 A.2d 561, 564 (1993). As we explained in *Hudson*, qualified immunity serves to protect government employees from exposure to personal tort liability that would: "(1) hamper or deter those employees from vigorously discharging their duties in a prompt and decisive manner, and (2) unfairly subject employees who have a duty to exercise discretion regarding matters of public policy to the judgment of those acting within a judicial system that is ill-suited to assess the full scope of factors involved in such decisionmaking." *Id.*

*Czechorowski*, 2005 VT 40 at ¶ 12, 178 Vt. at 527, 872 A.2d at 889.

Because Officer Emery's decision to tase Plaintiff to effect his arrest reflected an exercise of judgment that involved competing considerations based upon policy assessments, he was engaged in a discretionary not ministerial function. In addition,

because each component of Vermont's test for qualified immunity has been met, Officer Emery is immune from liability for Plaintiff's state law claims.  Summary judgment is therefore GRANTED in Officer Emery's favor and Plaintiff's remaining claims against him are DISMISSED.

### D.  Plaintiff's Claims Against the Town.

Plaintiff first claims that the Town is vicariously liable for the actions and omissions of Officer Emery, and second, that it was negligent in hiring, training, and supervising officers in its employ, including Officer Emery.  The Town responds that it cannot be held liable for Officer Emery's acts if he is not himself liable and it is entitled to sovereign immunity for any claims based upon its own acts or omissions because they occurred in the performance of a governmental function.

Because the court has ruled that Officer Emery is protected from tort liability by qualified immunity, the Town is entitled to summary judgment on Plaintiff's vicarious liability claims based upon Officer Emery's acts or omissions.  *See Czechorowski*, 2011 VT 40, at ¶ 28, 872 A.2d at 895 (holding that because "the claims against the State are derivative of the claims against the individual defendants, and because we have held that [state prosecutor]'s challenged conduct was protected by absolute and qualified immunity, the State claims predicated thereon must also fail."); *Winfield v. State*, 779 A.2d 649, 653 (Vt. 2001) ("Plaintiff's claims against the State are derivative of the tort claims against the individual defendants.  Since we have held that the conduct complained of was within the scope of the individual defendants' discretionary duties, or simply failed to violate any established rights to which plaintiff was entitled, we discern no basis for the claims against the State.").

The Town asserts that it is entitled to sovereign immunity for Plaintiff's remaining claims, alleging negligent hiring, training, supervision, and evaluation of the Town's police officers.  The doctrine of sovereign immunity, which "protects the state from suit unless immunity is expressly waived by statute[,]"*LaShay v. Dep't of Soc. & Rehab.*

*Servs.*, 625 A.2d 224, 228 (Vt. 1993), extends to municipalities in certain instances.[8]

Municipalities are "liable only where the negligent act arises out of a duty that is

proprietary in nature as opposed to governmental."[9]  *McMurphy v. State*, 757 A.2d 1043,

1047 (Vt. 2000) (quoting *Hillerby v. Town of Colchester*, 706 A.2d 446, 447 (Vt. 1997))

(internal quotation marks omitted).  The rationale for distinguishing between these two

municipal functions is that "municipalities perform governmental responsibilities for the

general public as instrumentalities of the state," but "they conduct proprietary activities

only for the benefit of the municipality and its residents."  *Hillerby*, 706 A.2d at 447.

In *Sobel v. City of Rutland*, 2012 VT 84, the Vermont Supreme Court recently

explained the distinction between governmental and proprietary functions:

> Governmental functions are those performed when a municipality
> "exercise[s] those powers and functions specifically authorized by the
> Legislature, as well as those functions that may be fairly and necessarily
> implied or that are incident or subordinate to the express powers."
> Proprietary activities, on the other hand, are, essentially, commercial
> activities performed by a municipality in its corporate capacity, for the
> benefit of the municipality and its residents, and unrelated to its "legally
> authorized activity."

*Id.* at ¶ 14 (internal citations omitted).  Following this distinction, the *Sobel* court

concluded that tax estimates performed by a tax assessor, while not required for the

---

[8] Plaintiff has not asserted that the Town waived sovereign immunity by statute; however, in
Vermont, a municipality will waive sovereign immunity if it purchases a policy of liability
insurance under 24 V.S.A. § 1092. *See* 29 V.S.A. § 1403. Notwithstanding this statutory
waiver, "[p]articipation by a municipality in an agreement or association established [pursuant to
this title] shall not . . . constitute a waiver of sovereign immunity under 29 V.S.A. § 1403." 24
V.S.A. § 4946. The waiver of sovereign immunity under 29 V.S.A. § 1403 "does not occur
when insurance or reinsurance is acquired through participation in an intermunicipal insurance
agreement such as VLCT PACIF." *McMurphy v. State*, 757 A.2d, 1043, 1048 (Vt. 2000). The
Town's liability insurance was acquired through participation in VLCT PACIF, so it did not
waive sovereign immunity.

[9] Vermont courts have acknowledged that "[t]he line between municipal operations that are
proprietary and those that are governmental is not clearly defined. The basis of the distinction is
difficult to state, and there is no established rule for the determination of what belongs to the one
or the other class." *Town of Stockbridge v. State Highway Bd.*, 216 A.2d 44, 46 (Vt. 1965).
However, Vermont is nonetheless "one of a minority of states that retains the governmental-
proprietary distinction." *Hudson*, 638 A.2d at 568 n.3.

performance of statutorily required duties, are nonetheless governmental functions because they are "ancillary and related to governmental functions." *Id.* at ¶ 16. In so ruling, the court noted that "[m]unicipalities derive no income or similar commercial return from estimating taxes." *Id.*

The Vermont courts have consistently found that police work is generally a governmental function. *See, e.g., Kent v. Katz*, 146 F. Supp. 2d 450, 458-59 (D. Vt. 2001) (upholding the categorization of police work as a governmental function even where plaintiff alleged the municipality failed to properly train and supervise its officers); *Decker v. Fish*, 126 F. Supp. 2d 342, 346 (D. Vt. 2000) ("[T]here can be little question that police work is a quintessential governmental function."); *Franklin Cnty. Sheriff's Office v. St. Albans City Police Dep't*, 2012 VT 62, ¶ 17 ("[T]he provision of police services in Vermont occurs outside the realm of commerce because it involves no interchange of goods or commodities on the open market. It is a governmental function provided only by governmental entities for the benefit of the public."); *W. Union Tel. Co. v. Burlington Traction Co.*, 99 A. 4, 8 (Vt. 1916) ("One of the powers of government inherent in every sovereignty is the governing and regulating of its internal police. And that it is a governmental function founded upon the duty of the state to protect the public safety, the public health, and the public morals.") (internal quotation marks omitted).

Other jurisdictions that similarly distinguish between proprietary and governmental activity for determining immunity have also concluded that police work is typically governmental. *See, e.g., Dorsey v. City of Detroit*, 858 F.2d 338, 345 (6th Cir. 1988) ("The activity in which the city was engaged . . . was providing police protection to its citizens, and that is a quintessentially governmental activity."); *Lemery v. Vill. of Cambridge*, 736 N.Y.S.2d 503, 505 (N.Y. App. Div. 2002) ("It is well settled that when a municipality is engaged in a governmental function 'undertaken for the protection and safety of the public pursuant to the general police powers' it generally will not be held liable for the negligent performance of those functions[.]") (internal citation omitted).

The parties do not dispute that Officer Emery tased Plaintiff during the course of his employment with the Brattleboro Police Department. Moreover, even if Officer

Emery's conduct exceeded the scope of his authority under the Use of Force Policy, his allegedly "tortious conduct partially implements law enforcement goals, however inappropriately." *Doe v. Forrest*, 2004 VT 37, ¶ 18, 176 Vt. 476, 484, 853 A.2d 48, 55 (explaining that "where a law enforcement official is overly aggressive in attempting to obtain information from a suspect or in performing the arrest of a suspect . . . the tortious conduct partially implements law enforcement goals, however inappropriately" and is, therefore, within the scope of employment). Accordingly, to the extent the direct claim against the Town arises out of the tasing,[10] municipal immunity would protect the Town from liability.

Plaintiff, however, points out that he is also challenging the adequacy of the Town's Taser training and supervision[11] and adequacy of the Town's process for evaluating whether an officer has violated the Use of Force Policy.[12] Most courts, including this one, have concluded that training police officers and evaluating their conduct both fall within the governmental function of police work. *See Treon v. Whipple*, 212 F. Supp. 2d 285, 290 (D. Vt. 2002) (finding city was entitled to immunity with respect to claim for failing to train and supervise police officers); *Katz*, 146 F. Supp. 2d at 458-59 (same); *DiGiorgio v. Cleveland*, 2011-Ohio-5878, at ¶ 22 (finding that none of the exceptions to immunity, which included "negligent conduct of employees while carrying out a proprietary function[,]" extended to training, supervising, or disciplining police). This remains true even when training and supervision are performed by the third parties with whom the municipality contracts. *See, e.g., Courchesne v. Town of Weathersfield*, 2003 VT 62, ¶ 13, 175 Vt. 585, 588, 830 A.2d 118, 122 (finding that town

---

[10] In order to establish that the Town caused his damages, Plaintiff would necessarily have to rely on the tasing as part of his claim against the Town.

[11] In particular, Plaintiff asserts that the list of circumstances in the Policy where an officer may deploy a Taser should be considered exclusive. He argues that the Town acted negligently in training officers, that the list was exemplary, and that there may be other circumstances where use of a Taser is reasonable and permissible.

[12] Plaintiff argues that the Town should not consider the totality of the circumstances when evaluating whether an officer has complied with the Use of Force Policy.

was entitled to sovereign immunity with respect to the operations of its gravel pit, even though it contracted with a private entity to manage the gravel pit, explaining that, "[i]ts primary objective for entering into the gravel pit agreements was to serve a public, governmental purpose; the gravel pit management agreement was not set up as a pretext to conceal a private, proprietary use."); *McCloud v. Nimmer*, 595 N.E.2d 492, 495 (Ohio Ct. App. 1991) (rejecting argument that police training is not a governmental function simply because it is performed by private colleges and organizations, the court explained that "what entity actually performs [police services] . . . on behalf of a political subdivision has no bearing on their status as governmental"); *Murray v. Northrop Grumman Info. Tech., Inc.*, 444 F.3d 169, 175 (2d Cir. 2006) ("[T]he same policy considerations that justify immunity for government employees can apply with equal force to private actors when they are charged with implementing government policies.").

Here, even if hiring, training and supervising police officers were not themselves governmental functions, they are each necessary to carrying out the governmental function of police work, and they are not performed for income or other commercial gain. Thus, they are, at a minimum, "reasonably related to the governmental function of [police work]." *Sobel* at ¶ 13. The court thus concludes that the Town is entitled to sovereign immunity for Plaintiff's remaining claims against it. The court, therefore, GRANTS the Town's motion for summary judgment and DISMISSES Plaintiff's state law claims against it.

## CONCLUSION

For the reasons stated above, the court GRANTS the Town's motion for summary judgment (Doc. 42) as to Plaintiff's state law claims. The court also GRANTS Officer Emery's motion for summary judgment (Doc. 43) as to Plaintiff's state law claims. The court directs the clerk to enter final judgment in the Town and Officer Emery's favor.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this _28th_ day of November, 2012.

Christina Reiss, Chief Judge
United States District Court